# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

IN RE:

|  |  |
|---|---|
| **AURORA & ASSOCIATES, INC.,** | **Case No. 03-74627-t** |
|  | **Chapter 7** |
| **Debtor.** | **Hon. Thomas J. Tucker** |

---

**HEALTH CARE PARTNERS, INC.,**
**a Michigan Corporation,**

|  |  |
|---|---|
| **Plaintiff,** | **Adv. No. _____** |

v.

**JOSEPH J. WHALL, THE WHALL GROUP, LTD.,**
**SCHAFER & WEINER, PLLC, MICHAEL E. BAUM,**
**JOSEPH K. GREKIN, CHARLES D. BULLOCK,**
**STEVENSON & BULLOCK PLC, ELENA SZILVAGYI,**
**DAVID SZILVAGYI, and PATERNO DOREZA,**

**Defendants.**

---

## COMPLAINT
### AND
## DEMAND FOR JURY TRIAL

Health Care Partners, Inc. ("HCP"), by its counsel, states:

### PARTIES, VENUE, AND JURISDICTION

1. In this Complaint, HCP seeks to recover treble and civil damages and related relief for

its postpetition claims against Defendants. These include HCP's claims for RICO violations,

RICO conspiracy, civil conspiracy, fraud on the court, breach of fiduciary duty, fraudulent

misrepresentation, automatic stay violations, embezzlement, conversion, and accounting. HCP

also objects to Chapter 11 professionals' fee applications, seeks the professionals' disgorgement

of payments from the Debtor and Insiders, and seeks to vacate the professionals' employment

orders.

2. This Court has jurisdiction over this action and the parties pursuant to 28 U.S.C. §1334(b).

3. This action is a core proceeding pursuant to 28 U.S.C. §157.

4. Health Care Partners, Inc. is a Michigan corporation with offices located at 18000 W. 9 Mile Road, Suite 400, Southfield, MI 48075

5. Joseph K. Whall is an individual who resides in or does conduct or has conducted business in this District.

6. The Whall Group is a Michigan corporation with offices located at 2701 Cambridge Court, Suite 105, Auburn Hills, MI 48326. The Whall Group conducts business in this District.

7. Schafer & Weiner, PLLC, is a professional corporation with offices located at 40950 Woodward Avenue, Suite 100, Bloomfield Hills, MI 48304 (S&W). S&W conducts business in this District. S&W acted as special counsel for the Chapter 11 Debtor.

8. Michael E. Baum is an individual who resides in and conducts business in this District. Baum is a principal of S&W.

9. Joseph K. Grekin is an individual who conducts business in this District. Grekin is employed as an associate by S&W.

10. Charles D. Bullock is an individual who conducts business in this District. Bullock is a principal of Stevenson & Bullock, PLC, and acted as general counsel for the Chapter 11 Debtor.

11. Stevenson & Bullock, PLC, is a professional corporation located at 29800 Southfield Road, Southfield, MI 48076 ("S&B"). S&B acted as the Chapter 11 Debtor's general counsel.

12. Elena Szilvagyi is an individual who resided in this District and who is currently

imprisoned in a federal penitentiary in Lexington, Kentucky.

13. David Szilvagyi is an individual who resided in this District and who is currently imprisoned in a federal penitentiary in Pennsylvania.

14. Paterno Doreza is an individual who resides and conducts business in this District.

15. Elena and David Szilvagyi are married. Paterno Doreza is the father of Elena Szilvagyi. Paterno Doreza is the President of Prime Care Services, Inc. and the owner of Supra Enterprises, Inc.

16. For purposes of convenience, Whall, The Whall Group, S&W, Baum, Grekin, Bullock, and S&B will be referred to as the "Chapter 11 Professionals."

17. For purposes of convenience, Elena Szilvagyi, David Szilvagyi, and Paterno Doreza will be referred to as the "Insiders."

## STATEMENT OF RELEVANT FACTS

18. In September 2003, Elena Szilvagyi, David Szilvagyi, and Prime Care Services, Inc. ("PCS") were indicted on Medicare fraud and other charges.

19. Upon information and belief, the Debtor and/or the Insiders retained Bullock and S&B as counsel, and as such, Bullock and S&B performed prepetition legal services for the Debtor from October 2003 through the Filing Date.

20. In November 2003, upon Bullock's recommendation, the Debtor and/or Insiders retained Tony DiPonio as legal counsel.

21. On November 10, 2003, DiPonio forwarded a letter to HCP, stating that Gregory and Arturo Doreza were the new owners of the Debtor.

22. Upon information and belief, the Insiders paid Bullock or S&B "chunks of money" for its prepetition and/or postpetition fees.

23. On December 16, 2003 (the "Filing Date"), the Debtor purported to file its Chapter 11 Petition, Statement Regarding Corporate Ownership, Statement Regarding Authority to Sign and File Petition, and List of Equity Security Holders. These pleadings were signed by David Szilvagyi, who represented himself to be the sole shareholder, sole officer, and sole director of the Debtor.

24. Contrary to Mr. Szilvagyi's representations, Elena Szilvagyi was a 50% shareholder, CEO, and director of the Debtor. Accordingly, the Debtor's Chapter 11 pleadings were not validly filed. Upon information and belief, Bullock knew that these Chapter 11 pleadings were false and invalidly filed.

25. On the Filing Date, the Debtor was indebted to HCP in an amount exceeding $1,000,000, as evidenced by the Debtor's 2003 year-end statements. The Chapter 11 Professionals knew that HCP had a valid claim against the Debtor's estate.

26. Upon information and belief, (a) the Insiders met with the Chapter 11 Professionals at Bullock's office on December 22, 2003, (b) Elena and David Szilvagyi told the Chapter 11 Professionals that, pursuant to a guilty plea for Medicare fraud, the Szilvagyis and PCS would be required to pay restitution of at least $865,000 and other fines (the "Criminal Restitution Claims"), (c) the Chapter 11 Professionals knew that the Debtor was not operating, that it had no money, that it could not reorganize, and that it could not pay their Chapter 11 fees, (d) the Chapter 11 Professionals would never have agreed to represent the Chapter 11 Debtor unless they had reasonable assurances that the fees could and would be paid by some third party, and (e) the Chapter 11 Professionals and the Insiders agreed to the Insiders' payment of the Professionals' fees, the terms of which agreement are yet undisclosed.

27. Upon information and belief, S&W recommended that Whall and The Whall Group

represent the Chapter 11 Debtor in its case. During the Chapter 11 case, the Chapter 11 Professionals represented to HCP's counsel that Whall had a "special relationship" with the U.S. Attorney's Office and a certain federal district court judge.

28. Upon information and belief, at the December 22nd meeting and later meetings, the Chapter 11 Professionals and the Insiders unlawfully agreed to use the Debtor's estate, the bankruptcy system, the U.S. Attorney's Office ("USAO"), and the U.S. Trustee's Office to extort monies from HCP or to obtain the substantive consolidation of the Debtor, PCS, HCP, and Autumn Ridge for the purposes of satisfying the Criminal Restitution Claims and obtaining a sentence reduction for the Szilvagyis at sentencing.

29. Bullock prepared and David Szilvagyi signed a Consent Resolution purportedly authorizing the Debtor to employ both Whall as its CEO and The Whall Group as forensic accountants on or about January 19, 2004. The Consent Resolution required the Court to approve Whall's and The Whall Group's employment.

30. The Consent Resolution was invalid because it was approved only by David Szilvagyi. The Chapter 11 Professionals knew that the Consent Resolution was invalid when signed.

31. In February 2004, Elena Szilvagyi, David Szilvagyi, and Paterno Doreza, on behalf of PCS, plead guilty to Medicare fraud and agreed jointly to pay restitution of $865,000 to DHHS.

32. In February 2004, S&W filed a Complaint against HCP and Autumn Ridge and later filed an Amended Complaint asserting that HCP and Autumn Ridge were "alter egos" of the Debtor. At such times, the Court had not yet entered an Order authorizing S&W's employment.

33.  The Debtor had no standing to assert the alter ego claims.  The Chapter 11 Professionals knew the Debtor lacked standing when the Debtor's Complaints were filed.

34.  On March 4, 2004, the Chapter 11 Professionals met with USAO attorneys, FBI special agents, DHHS representatives, and a U.S. Trustee's Office attorney who acted as a liaison with the USAO on criminal referrals.  Whall prepared a meeting agenda entitled the "Szilvagyi Universe Workgroup Meeting Agenda." Upon information and belief, the purpose of the meeting was to discuss strategies for effecting HCP's and Autumn Ridge's payment of the Criminal Restitution Claims held by the DHHS.

35.  Upon information and belief, the Chapter 11 Professionals, the USAO, and DHHS had numerous other meetings and communications concerning courses of action for effecting HCP's and Autumn Ridge's payment of the Criminal Restitution Claims held by the DHHS, the payment of which was a common interest of the U.S. government and the Szilvagyis.

36.  Upon information and belief, the Chapter 11 Professionals attempted to improperly influence and may have improperly influenced the USAO, the FBI, and DHHS to pursue criminal and civil actions against HCP and Autumn Ridge for purposes of compelling HCP and Autumn Ridge to pay Criminal Restitution Claims, the payment of which was a common interest of the U.S. Government and the Szilvagyis.

37.  Upon information and belief, the Chapter 11 Professionals have intentionally concealed their meetings and communications with the USAO, the FBI, and the DHHS, knowing that they were unlawful and improper.

38.  As outlined in Whall's agenda, the USAO filed a civil complaint against Insiders, HCP, and Autumn Ridge on June 14, 2004.  The Complaint conclusorily alleged that HCP and Autumn Ridge were "alter egos" of the Szilvagyis and PCS.  Based upon the government's

conclusory and unsupported allegations, the District Court entered Orders freezing HCP's bank accounts and enjoining HCP from paying business and other expenses.

39.  Coincidentally, when it filed the civil complaint: the USAO and FBI raided HCP's office, seizing all HCP records, patient files, and computer equipment and effectively shutting down HCP's home health care operations.  As of the date of this Complaint, the USAO has refused to return all such seized records and property.

40.  On June 30, 2004, the Debtor filed its initial Plan and Disclosure Statement.  In its Plan, the Debtor attached the USAO's civil complaint against HCP and Autumn Ridge as evidence that its Plan was feasible, that its own alter ego action had validity, and that HCP and its principals had engaged in fraudulent conduct.

41.  Coincidentally, shortly after the Debtor's Plan was filed, the USAO requested that HCP and Autumn Ridge consent to the dismissal of its alter ego complaint.  HCP and Autumn Ridge consented to the entry of dismissal orders.  Upon information and belief, the USAO requested dismissal because it did not want any dispositive order in such action to bar the USAO from threatening and/or obtaining an indictment against HCP and Autumn Ridge.

42.  In subsequent amended Plans and Disclosure Statements, the Debtor continued to rely on the USAO's complaint against HCP and Autumn Ridge, failing to note that it had been dismissed at the request of the USAO.

43.  From the beginning of the Debtor's Chapter 11 case, HCP's counsel demanded that the Chapter 11 Professionals pursue Chapter 5 causes of action against the Insiders.

44.  Notwithstanding HCP's demands, the Chapter 11 Professionals never filed actions against Insiders to recover potentially millions of dollars of avoidable transfers.  The Chapter 11 Professionals represented to HCP's counsel and perhaps the Court that it chose not to pursue

Insider claims because the Insiders were uncollectible. In a letter dated April 4, 2004, Grekin confirmed that the Debtor should file "preference actions against several insiders, but that no actions should be filed until his agreement with Whall had agreed not to pursue Insider claims "until the substantive consolidation action is resolved, or until the statute of limitations requires it."

45. At the Section 341 meeting of creditors, Whall stated that as responsible person for the Debtor-in-Possession, he should sue the Szilvagyis for millions of dollars of avoidable transfers:

> MR. BULLOCK: . . . The first of a number of lawsuits have been filed, and frankly there's a better than even chance that there will be litigation instituted against the Szilvagyis, against - -
>
> THE WITNESS: Significant.
>
> MR. BULLOCK: Significant litigation against the Szilvagyis, and a number of other parties. There are creditors in the case that are concerned about the Szilvagyis not being sued.
>
> THE WITNESS: The principals of the company took out around $4 million in the last 12 months.

44. The Debtor's various Disclosure Statements state:

> These projections are based on a review of previously filed cost reports for the Affiliated Companies. It is also anticipated that upon a successful resolution of the substantive consolidation adversary proceeding, monthly payments will be available to satisfy outstanding fines assessed against the companies by the DHHS. Further it is Joseph Whall and the Whall Group's position that upon the successful conclusion of the substantive consolidation adversary proceeding substantial compensation will be adjudicated and returned to the government prosecution team via the Whall Group's oversight of the management of the entities.

45. Bullock prepared and David Szilvagyi signed a Consent Resolution purportedly authorizing the Debtor to employ Basil Simon as its CEO in June 2004.

46. The Consent Resolution was invalid because it was approved only by David

Szilvagyi, a 50% shareholder, and not Elena Szilvagyi, the other 50% shareholder. The Chapter 11 Professionals knew the Consent Resolution was invalid at the time it was signed.

47. The Consent Resolution required the Bankruptcy Court to enter an Order approving Simon's employment as CEO. The Chapter 11 Professionals never filed an application to employ Simon.

48. In August 2004, HCP's counsel, Guy C. Vining and Todd M. Halbert, met with Baum, Bullock, and Simon at Simon's office to discuss the dismissal of the Debtor's complaint against HCP. During the meeting, Halbert detailed numerous violations of the Bankruptcy Rules and the Bankruptcy Code by S&W and other Professionals. Baum then stated: "Todd, you don't understand, . . . the rules don't apply to us, . . . they apply to you." During the meeting, Baum also stated that the Debtor would not reach any agreements with HCP unless the Szilvagyis were released from estate claims.

49. The Chapter 11 Professionals engaged in other misconduct during the Chapter 11 case, including:

A. Debtor's Schedules were never verified. The Debtor's Schedules, signed by convicted felon David Szilvagyi, were never verified by Szilvagyi or Whall at the Chapter 11 Section 341 meeting. In fact, Whall stated that the Schedules had to be amended. They never were.

B. HCP was denied its right to attend the Section 341 meeting and to examine Whall. HCP attended the first chapter 11 section 341 meeting. When Whall could not answer a single question about the Debtor's financial affairs, the U.S. Trustee adjourned the meeting without date. HCP intended to examine Whall in depth at the adjourned hearing. However, the U.S. Trustee and Debtor's counsel held the adjourned meeting without notifying HCP. HCP believes this omission was intentional.

C. Debtor's Professionals were employed by the Szilvagyis, the Debtor's owners. The Professionals subject to severe conflicts of interest, failed to disclose these conflicts, concealed agreements with insiders for the payment of fees, and concealed insider fee payments.[6] The Debtor's estate had fraudulent conveyance and other claims against the Szilvagyis and Paterno Doreza exceeding

D. After entry of the Sale Order, the Chapter 11 Professionals concealed and refused to turn over the Debtor's records to HCP. After conversion of the Debtor's case to Chapter 7, the Professionals failed to turn over the Debtor's records, including their case files (the "Professionals' Files"), to the estate until weeks after the Permanent Trustee's demand that they do so.

E. The Chapter 11 Professionals violated numerous criminal and civil statutes.

50. The Debtor's Chapter 11 case was converted to a Chapter 7 case on June 22, 2005.

51. James E. Mies is the permanent trustee for the Debtor's Chapter 7 estate.

### COUNT XII - VIOLATIONS OF THE RACKETEERING AND CORRUPT ORGANIZATIONS ACT

52. HCP incorporates by reference Paragraphs 1 through 51 as if the same were fully set forth herein.

53. As described above, the Insiders and the Chapter 11 Professionals conspired against HCP, Debtor's creditors, the Estate, and the Court.

54. As part of the scheme to defraud, the Chapter 11 Professionals and Insiders corrupted the bankruptcy process and improperly influenced the USAO to pursue criminal and civil actions against HCP.

55. The multifarious racketeering activities through which the Insiders and Chapter 11 Professionals' broad objectives were carried out consisted of a complex pattern of individual transactions and groups of transactions.

56. It was a part of the scheme to defraud that the Insiders and Chapter 11 Professionals would and did agree and conspire with each other to devise and participate in a plan of deceit and deception, whereby they would obtain and abuse their positions of trust and fiduciary relationships with the Court and the Debtor's estate; they would and did abuse the discretion granted to them and breach their obligations of loyalty and fidelity and their duty to act honestly and faithfully in the best interests of the Debtor's estate and not for their own interests; and they

would and did use false and fraudulent pretenses, representations, and promises calculated to deceive persons of ordinary prudence and due care and make material nondisclosures and concealment of material fact and information important to HCP, Debtor's creditors, the estate, and the Court, important for such entities and individuals to make decisions regarding the administration of the Debtor's estate, all so as to unlawfully, intentionally, and willfully, and with intent to defraud, that is, knowingly and with specific intent to deceive in order to cause financial gain to themselves, procure secret profits, compel HCP and Autumn Ridge to pay the Criminal Restitution Claims, to divert assets and proceeds of the Debtor's estate to the use and benefit of themselves and others and to the detriment of HCP, Debtor's creditors, the estate, the Court, and the integrity of the bankruptcy system.

57. The scheme to defraud evolved over time as a pattern of racketeering activities that inflicted discrete harm on HCP, creditors, the Court, and the integrity of the bankruptcy system.

58. HCP, Autumn Ridge, creditors, and the estate suffered discrete losses as a result of the Insiders' and Chapter 11 Professionals' activities.

59. In carrying out their scheme to defraud HCP, Autumn Ridge, creditors, the estate, the Court, and the bankruptcy system, the Insiders and Chapter 11 Professionals engaged, among other things, in conduct in violation of federal and state laws, as set forth above.

60. The Insiders and Chapter 11 Professionals acted with malice, insult, intent and knowledge, and with a wanton and reckless disregard of the rights of HCP, Autumn Ridge, creditors, the Court, and the bankruptcy system.

61. During all relevant times, the Insiders' and Chapter 11 Professionals' enterprise was engaged in interstate commerce.

62. During all relevant times, and in furtherance of and for the purpose of executing the

scheme to defraud, The Insiders and Chapter 11 Professionals on numerous occasions used and caused to be used mail depositories of the U.S. Postal Service by both placing and causing to be placed mailable matter in the depositories and by removing and causing to be removed mailable matter from the depositories, constituting the offense of mail fraud as proscribed and prohibited by 18 U.S.C. §1341.

63.   During all relevant times, and in furtherance of and for the purpose of executing their scheme, the Insiders and Chapter 11 Professionals on numerous occasions used and caused to be used wire communications in interstate commerce, by both making and causing to be made telephone calls and other wire communications, as proscribed and prohibited by 18 U.S.C. §1343.

64.   HCP is a "person" within the meaning of 18 U.S.C. §§1961(3) AND 1964(C).

65.   The Insiders and Chapter 11 Professionals are each a "person" within the meaning of 18 U.S.C. §§1961(3) AND 1964(C).

66.   The Insiders and Chapter 11 Professionals' association is an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce at the relevant times.

67.   Alternatively, the Debtor's bankruptcy estate is an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c), which enterprise was engaged in and the activities of which affected interstate commerce at the relevant times as a result of the Insiders' and Chapter 11 Professionals' unlawful activities.

68.   The Insiders and Chapter 11 Professionals were each employed by or associated with an enterprise, and did conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C.

§§1961(1)(B) and 1961(E) and 1961(5) and 1962(c).

69. By reason of the Insiders and Chapter 11 Professionals' violation of 18 U.S.C. §1962(c), HCP was injured in an amount believed to be not less than $1,000,000, within the meaning of 18 U.S.C. 1964(c).

70. The Insiders and Chapter 11 Professionals were each employed by or associated with an enterprise, conspired within the meaning of 18 U.S.C. §1962(d) to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1)(B) and 1961(E) and 1961(5) and 1962(c).

71. By reason of the Insiders' and Chapter 11 Professionals' violation of 18 U.S.C. §1962(d), HCP was injured in an amount believed to be not less than $1,000,000, within the meaning of 18 U.S.C. 1964(c).

## COUNT II - CONVERSION

72. HCP incorporates by reference Paragraphs 1 through 73 as if the same were fully set forth herein.

73. Debtor's payments to the Chapter 11 Professionals (the "Retainers") were and continued to be property of the estate through the entry date of the Sale Order (the "Sale Order Date").

74. As of the Sale Order Date, the Debtor's estate had ownership, title, and the right to possession and control of the Retainers.

75. Pursuant to the Sale Order, the Debtor sold its interest in the Retainers to HCP.

76. As set forth above, the Chapter 11 Professionals have no ownership, title, or lawful right to possession or control of the Retainers.

77. The Chapter 11 Professionals have refused HCP's demands that they turn over the Retainers to HCP pursuant to the Sale Order.

78. The Chapter 11 Professionals' taking and control of the Retainers in contravention of HCP's rights constitutes an unlawful conversion of property of the Debtor's estate under MCLA §600.2919a and Michigan common law.

79. As a direct and proximate result of such conversion, HCP has been damaged.

80. The Chapter 11 Professionals are jointly and severally liable for such damages.

## COUNT III - AUTOMATIC STAY VIOLATIONS

81. HCP incorporates by reference Paragraphs 1 through 80 as if the same were fully set forth herein.

82. After the Filing Date and as described above, the Insiders and the Chapter 11 Professionals willfully and maliciously violated the automatic stay under §362(a) of the Code by exercising control over the property and administration of the Debtor's estate for the benefit of the Insiders and the U.S. government.

83. HCP has been damaged as a result of the stay violations.

84. Pursuant to Sections 362(h) and 105 of the Code, HCP may recover from the Chapter 11 Professionals, jointly and severally, HCP's actual damages, interest, attorneys fees, costs, and punitive damages.

## COUNT IV - FRAUD ON THE COURT

85. HCP incorporates by reference Paragraphs 1 through 84 above as if the same were fully set forth herein.

86. At all relevant times, the Chapter 11 Professionals were officers of the court.

87. As officers of the court, the Chapter 11 Professionals owed duties of honesty and

loyalty to the court.

88. By virtue of their control of the administration of the Debtor's estate, the Insiders also owed duties of honesty and loyalty to the court.

89. Through their false representations and omissions of material fact as described above, the Chapter 11 Professionals and the Insiders violated such duties and perpetrated a fraud on the court that impaired the court's ability to perform its impartial task of adjudging cases.

90. When they made the misrepresentations and omissions, the Chapter 11 Professionals and the Insiders knew that their representations and omissions were not true or they recklessly disregarded their falsity or omission.

91. By perpetrating repeated frauds on the court, the Chapter 11 Professionals and the Insiders illegally obtained the entry of Orders benefitting themselves. including the Employment Orders.

92. S&W and The Whall Group, as principals, are responsible for the actions of their agents, Michael Baum, Joseph Grekin, Charles D. Bullock, and Joseph Whall.

93. HCP was damaged by the repeated frauds on the court.

94. Because of the Chapter 11 Professionals and Insiders' fraud on the court, the Employment Orders must be vacated.

## COUNT V - BREACH OF FIDUCIARY DUTY

95. HCP incorporates by reference Paragraphs 1 through 94 above as if the same were fully set forth herein.

96. As bankruptcy professionals, the Chapter 11 Professionals owed fiduciary duties to HCP, other creditors, and the Debtor's estate, including the duties of loyalty, honesty, absence of self-dealing, good faith, and fair dealing.

97.  The Chapter 11 Professionals and the Insiders exercised unlawful control over the Debtor's estate for the benefit of the Insiders and the U.S. government and to the detriment of HCP.

98.  By exercising control over the Debtor's estate, the Insiders assumed fiduciary duties to HCP, other creditors, and the estate.

99.  As set forth above, the Chapter 11 Professionals and the Insiders breached their fiduciary duties to HCP.

100.  The Chapter 11 Professionals and the Insiders acted in their own self-interests as described above.

101.  The Insiders, as principals, are each responsible for the actions of their agents, the Chapter 11 Professionals.

102.  At all relevant times, the interests of the Chapter 11 Professionals and the Insiders conflicted directly with their fiduciary duties to HCP.

103.  As a direct and proximate result of such breaches, HCP has been damaged.

104. The Chapter 11 Professionals and the Insiders are jointly and severally liable for all such damages.

## COUNT VI - INDUCING BREACH OF FIDUCIARY DUTY

105.  HCP incorporates by reference Paragraphs 1 through 104 above as if the same were fully set forth herein.

106.  As described above, the Insiders and perhaps others knowingly induced the Chapter 11 Professionals to breach their fiduciary duties to HCP.

107.  As a direct and proximate result of such inducement, HCP has been damaged.

108.  The Insiders, as principals, are responsible for the actions of their agents, the

Chapter 11 Professionals.

109. The Insiders and the Chapter 11 Professionals are jointly and severally liable for all such damages.

## COUNT VII - FRAUDULENT MISREPRESENTATIONS

110.  HCP incorporates by reference Paragraphs 1 through 109 above as if the same were fully set forth herein.

111.  As set forth in the preceding paragraphs, the Chapter 11 Professionals and the Insiders intentionally made false representations and omissions of material fact to HCP, other creditors, and the Court.

112.  The representations were false when made.

113.   The Chapter 11 Professionals and Insiders knew that the representations were false when made or they made them recklessly without knowing whether they were true.

114.  The Chapter 11 Professionals and Insiders intended that HCP and the Court rely on the  representations.

115.  HCP and the Court reasonably relied on the representations.

116.  The Chapter 11 Professionals and Insiders made the false representations and omissions intentionally and maliciously.

117.  As a direct and proximate result of the false representations and omissions, HCP suffered damages.

118.   The Chapter 11 Professionals and Insiders are jointly and severally liable for the damages.

## COUNT VIII - TORTIOUS INTERFERENCE WITH
## CONTRACTUAL RELATIONS AND BUSINESS EXPECTANCIES

119.  HCP incorporates by reference Paragraphs 1 through 118 as if the same were fully

set forth herein.

120. At the time that the USAO filed the civil alter ego action and seized under pretense of criminal warrant HCP's assets, the Debtor had contracts and business relationships and expectancies, including its business relationship with Medicare.

121. HCP's business relationships and expectancies had a reasonable likelihood of future economic benefit for the Debtor.

122. The Chapter 11 Professionals knew of HCP's contracts and business relationships.

123. As described above, the Chapter 11 Professionals and Insiders intentionally and improperly interfered with HCP's contracts and business relationships.

124. The Chapter 11 Professionals and Insiders intended to and did interfere with HCP's contracts, business relationships, and expectancies, causing their breach, disruption, and termination.

125. As a direct and proximate result of the Chapter 11 Professionals' and Insiders' wrongful conduct, HCP suffered damages.

## COUNT IX - ACCOUNTING

126. HCP incorporates by reference Paragraphs 1 through 125 as if the same were fully set forth herein.

127. The Chapter 11 Professionals have violated their duty to provide complete and adequate information concerning various matters, including, but not limited to, the Debtor's postpetition transfers, the Debtor's and Insiders' payments to Professionals, .,..

128. Neither HCP nor the Permanent Trustee can reasonably be expected to adequately ascertain and account for the foregoing matters.

129. HCP and the Permanent Trustee are entitled to separate and complete accountings

from each of the Chapter 11 Professionals regarding the foregoing matters.

## COUNT X - OBJECTIONS TO FEE APPLICATIONS

130.  HCP incorporates by reference Paragraphs 1 through 129 as if the same were fully

set forth herein.

131.  HCP objects to the S&W and S&B Fee Applications for the following reasons:

A.     As set forth above, S&W and S&B, together with Whall and The Whall Group, engaged in massive criminal and civil misconduct, including, conspiring to defraud the United States and HCP, conspiring to violate federal laws, perpetrating a massive fraud on the Court, and breaching their fiduciary duties to HCP and the estate.

B.     S&W and S&B were never validly employed by the Court because (1) they were subject to conflicts of interest, (2) they intentionally concealed such conflicts from the Court and creditors to secure their employment, and (3) David Szilvagyi, as a mere 50% shareholder, lacked authority to retain them as counsel.

C.     S&W and S&B filed and/or served on the U.S. Trustee's Office false Affidavits of Disinterestedness:

1.     In his Affidavit of Disinterestedness for S&B's employment, Bullock misrepresented that "neither he nor any member of [S&B] has ever been employed by or had any connection with the Debtor, Debtor's creditors or any other party in interest, their respective attorney[s], accountants or the U.S. Trustee, that he has no interest adverse to the Debtor, the creditors or the Estate, that he and the firm are disinterested person as defined by 11 U.S.C. §101(14), . . . and that he knows no reason why he and the firm Stevenson & Bullock, P.L.C., should not act as counsel for the Debtor;"

2.     In their Affidavit of Disinterestedness served on the U.S. Trustee but never filed with the Court, S&W and Baum misrepresented that Baum and S&W (a) "neither I, nor my firm, represent or hold any interest adverse to the Debtor or to the estate with respect to the services for which we are seeking employment," (b) "that Applicant is a 'disinterested person' as that term is defined in 11 U.S.C, 101(14)," and (c) "the law firm of Schafer and Weiner are disinterested and have had no connection with the Debtor, Debtor-in-Possession, creditors or any other party in interest, their respective attorneys and accountants, the U.S. Trustee or any of his employees."

D.     Upon information and belief, Bullock signed and filed on S&B's behalf a false Bankruptcy Rule 2016(b) statement:

1.      S&B's 2016(b) statement states that S&B received a $1,114 retainer, the source of which was $1,600 from David Szilvagyi and also the Debtor's funds. Answer #9 to the Debtor's Statement of Financial Affairs states that S&B received a $3,497 retainer from the Debtor alone. The Debtor's check register reflects no payments to S&B through December 31, 2003. According to DiPonio, "chunks of money" were paid to S&B. Upon information and belief, S&B provided prepetition services for the Debtor, that it billed the Debtor for such services, and that S&B were paid for such services by the Insiders. Upon further information and belief, S&B and Insiders reached an agreement for the payment of S&B's postpetition services by the Insiders.

E.      S&W never filed a Bankruptcy Rule 2016(b) statement. Upon information and belief, S&W more often than not files no Bankruptcy Rule 2016(b) statements as Chapter 11 Debtor's counsel unless compelled to do so by the U.S. Trustee's Office or by other circumstances. As a result of their failure to file the statement in this case, S&W failed to disclose

F.      S&W (and perhaps S&B) failed to file required Bankruptcy Rule 2016(b) statements for payments received both before and after the entry of their Employment Order.

G.      S&W's and S&B's refusal to categorize professional services deprives HCP of a meaningful opportunity to review and respond to their Fee Applications. They have listed services which fall within numerous areas requiring separate categorization, including: (1) Asset Analysis and Recovery: Identification and review of potential assets including causes of action and non-litigation recoveries; (2) Asset Disposition: Sales, leases (§ 365 matters), abandonment and related transaction work; (3) Claims Administration and Objections, Specific claim inquiries; bar date motions; analyses, objections and allowances of claims.; (4) Litigation: There should be a separate category established for each matter (e.g., XYZ Litigation); and (5) Plan and Disclosure Statement: Formulation, presentation and confirmation; compliance with the plan confirmation order, related orders and rules; disbursement and case closing activities, except those related to the allowance and objections to allowance of claims; and (6) Fee/Employment Applicants: Preparation of employment and fee applications for self or others; motions to establish interim procedures.

H.      S&W was appointed as special counsel under Section 327(e) of the Code to handle litigation and certain plan-related matters. They were not appointed as co-general counsel along with S&B. The U.S. Trustee Office's policy forbids co-general counsel where no out-of-state counsel is involved. Yet Schafer & Weiner performed a plethora of services which only general counsel may perform and be compensated. Further categorization will enable the Court and creditors to identify areas and services overlapping with general counsel's duties.

I.      Fee Applicants have failed to comply with local rules requiring the identification and explanation of the need for all inter-office conferences and intra-office conferences.

J.      HCP incorporates herein the fee objections set forth in its Extension Motion and its Reply to Objections to the Extension Motion.

WHEREFORE, HCP requests the Court to award its damages and grant other appropriate relief.

### DEMAND FOR JURY TRIAL

HCP hereby demands a trial by jury on all Counts of this Complaint so triable.

    /s/ Todd M. Halbert
TODD M. HALBERT (P33488)
Counsel for Health Care Partners
24359 Northwestern Hwy., #250
Southfield, MI 48075
248-356-6204

Dated: May 1, 2006